UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PORT AUTHORITY POLICE LIEUTENANTS
BENEVOLENT ASSOCIATION INC., ET AL.,

                                        Plaintiffs,

                    -v-

CITY OF NEW YORK, ET AL.,

                                        Defendants.

23 Civ. 560 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs, the Port Authority Police Lieutenants Benevolent Association, Inc. ("LBA")

and LBA's president, James Griglio, (collectively, "LBA Plaintiffs"), bring this action against

the Port Authority of New York and New Jersey ("Port Authority"), the City of New York (the

"City"), the New York City Fire Department ("FDNY"), and two individual defendants. They

challenge a "Mutual Aid Agreement" entered into between the above defendants. Dkt. 31 ("First

Amended Complaint" or "FAC") ¶¶ 1–2. The Mutual Aid Agreement ("Agreement") provides

for coordination between the Port Authority, which is responsible for "maintain[ing] safety and

security" at John F. Kennedy ("JFK") and LaGuardia ("LGA") airports, and the FDNY, in the

wake of any potential "Aircraft Emergency." *Id.* ¶¶ 4, 12. The LBA Plaintiffs argue that the

Agreement is *ultra vires* or otherwise null and void, for multiple reasons. They seek declaratory

relief from this Court to that effect. *See id.* ¶ 12.

Pending before the Court is defendants' motion to dismiss the FAC pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, the Court grants the

12(b)(1) motion and dismisses the complaint for want of subject matter jurisdiction, based on a

lack of standing. The Court, lacking jurisdiction, does not consider the 12(b)(6) motion.

## I.    Background

### A.    Factual Background[1]

The Port Authority is a "joint or common agency" of New York and New Jersey created via an interstate compact ratified by Congress in 1921.  *Bush Terminal Co. v. City of New York*, 273 N.Y.S. 331, 337 (Sup. Ct. 1934).  Among other powers and authority, the compact provides that the Port Authority has:

> [F]ull power and authority to purchase, construct, lease, and/or operate any kind of terminal or transportation facility [in the port] district; and to make charges for the use thereof; and for any of such purposes to own, hold, lease, and/or operate real or personal property, to borrow money and secure the same by bonds or by mortgages upon any property held or to be held by it.

42 Stat. 174 (1921).  Pursuant to this authority, the Port Authority entered into an agreement with the City in 1947 to lease the JFK and LGA airports; a version of that agreement remains in force today.  *See* FAC ¶¶ 23–24.  Under this lease, Port Authority is responsible for the operation and development of these airports, and, as relevant here, must "maintain safety and security at the Municipal Air Terminals at the highest possible levels[.]"  Brophy Decl., Ex. B ("Lease") at 57.  The Lease also precludes the Port Authority from delegating its responsibilities as lessee except in specific circumstances, providing:

> The Port Authority shall not delegate all or any portion of its (i) obligations or (ii) authority or discretion, under this Agreement, except, in either case, as such obligations, authority and discretion are customarily delegated to contractors, Subtenants and other third parties pursuant to contracts, subleases and other agreements entered into in the ordinary course of the business of maintaining and operating Air Terminals.

*Id.* at 58.

---

[1] The Court draws the facts in this decision principally from the FAC, and from a declaration and exhibits attached thereto submitted by defendants along with their motion to dismiss.  See Dkts. 42 ("Brophy Decl."), 45 ("Second Brophy Decl.").  For purposes of the motion to dismiss under Rule 12(b)(1), the Court may refer to evidence outside the pleadings.  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

In addition, both JFK and LGA have Airport Certification Manuals and Airport Emergency Plans. Such documents are mandated by federal regulation and must be approved by the Federal Aviation Administration. *See* FAC ¶ 32. These set out that, for both airports, an Incident Command System is to be used in case of an emergency. *Id.* These provide for an "Incident Commander" who, "for operational purposes" assumes "complete control of the incident's activities and coordination or resources." *Id.* (quoting JFK AEP Annex F4.6.2).

On August 1, 2022, the Port Authority, through individual defendants Terresa Rizzuto, the general manager of JFK, and Anthony Vero, General Manager of LGA, entered into the Mutual Aid Agreement with the City and the FDNY. Brophy Decl., Ex. A. ("Mutual Aid Agreement"). The Mutual Aid Agreement states that it was made in recognition of the fact that the Port Authority Fire Fighting Cadre "has expertise in aircraft rescue and firefighting," that its JFK and LGA units "wish to provide Aid and Assistance to the FDNY, subject to availability, for Aircraft Emergencies in the City of New York beyond Airport boundaries," and that "the FDNY has expertise in firefighting and wishes to provide Aid and Assistance to the Port Authority, subject to availability, for Aircraft Emergencies on the Airports." Mutual Aid Agreement at 1. As such, the Agreement provides that, where an airport requests help with an on-site emergency and the FDNY is available to help, the FDNY will provide aid to the Port Authority in emergency response. *Id.* at 2. The agreement adds that where the FDNY requests help with an Aircraft Emergency outside the airport grounds, the Port Authority Fire Fighting Cadre, subject to availability, will respond. *Id.*

To coordinate such collaboration, the Agreement further provides that the Port Authority Police Department "shall establish Incident Command for all Aircraft Emergencies on airport property." *Id.* at 3. If Port Authority requests FDNY resources in connection with an on-site

emergency, "Unified Command shall be established with the FDNY." *Id.* Unified Command is

defined in the agreement to mean:

> [T]he joint incident command structure formed from Incident Commanders of
> major organizations involved in the incident to coordinate an effective response,
> while at the same time allowing each organization to carry out their own
> jurisdictional, legal, and functional responsibilities.  Under Unified Command,
> command is jointly shared by two or more individuals, each already having
> authority in a different responding agency.

*Id.* at 2.

The LBA is an employee organization with sole responsibility for representing the Port

Authority's police lieutenants in collective bargaining.  FAC ¶ 17.  Its FAC asserts that,

"[h]istorically and continuing to this date, the responsibility to maintain safety and security at

JFK and LGA has been that of the Port Authority Police Department." *Id.* ¶ 27.  It asserts that

LBA members have "traditionally and historically performed" the function of "Incident

Commander with complete control of an airport emergency's activities and coordination of

resources." *Id.* ¶ 35.

**B.    Procedural History**

On January 23, 2023, the LBA Plaintiffs filed the complaint in this case.  Dkt. 1.  After

receiving several extensions, the defendants responded by moving for summary judgment and

filing supporting materials. *See* Dkts. 23–26.  The LBA Plaintiffs then filed the FAC.  Dkt. 31.

After an exchange of pre-motion letters, the Court held a pre-motion conference on July 21,

2023, at which the Court, guided by the parties, determined that "it would be more sensible for

the moving defendants to proceed by filing a motion to dismiss the First Amended Complaint,"

rather than a motion for summary judgment.  Dkt. 40.  The Court dismissed the pending motion

for summary judgment and set a briefing schedule for the anticipated motion to dismiss. *Id.*

On August 18, 2023, the defendants filed a joint motion to dismiss under both Rules 12(b)(1) and 12(b)(6), and a declaration in support thereof with attached exhibits. Dkts. 41–43 ("Port Authority Br."). On September 15, 2023, the LBA Plaintiffs filed an opposition. Dkt. 44 ("LBA Br."). On September 29, 2023, defendants filed a joint reply and an additional supporting declaration. Dkts. 45, 46 ("Port Authority Reply").

## II.     Defendants' Rule 12(b)(1) Motion

### A.     Applicable Legal Standards

A court must dismiss a claim for lack of subject matter jurisdiction under 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms, S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (citations and quotation marks omitted).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

**B.      Discussion**

Defendants make several arguments why the Court lacks subject matter jurisdiction and must dismiss the complaint.[2] For the reasons that follow, the Court finds that plaintiffs lack Article III standing to bring this action.  The Court therefore does not have occasion to reach the other arguments under Rule 12(b)(1).

"To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the complained-of conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Strubel v. Comenity Bank*, 842 F.3d 181, 187–88 (2d Cir. 2016) (internal quotation marks omitted).

The LBA Plaintiffs necessarily proceed on either a theory of organizational, or associational, standing, as the LBA is (and its president, Griglio, heads) an organization, representing the interest of Port Authority police lieutenants.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 341–44 (1977).  Under the organizational theory of standing, "an association may have standing in its own right to seek judicial relief to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Under the associational theory of standing, "an association has standing to bring suit on behalf of its members." *Hunt*, 432 U.S. at 343.  Plaintiffs have not specified the theory on which they proceed.  In an abundance of caution, the Court considers each.

**1.      Organizational Standing**

An association may have standing to sue in its own right when it is its own rights, as an organization, that it seeks to vindicate.  To establish organizational standing, a plaintiff-organization "must meet the same standing test that applies to individuals." *Irish Lesbian & Gay*

---

[2] Although the City, the FDNY, and defendant Hodges only join portions of the motions to dismiss, all defendants challenge plaintiffs' standing.  *See* Port Auth. Br. at 1.

*Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (cleaned up). That is, the organization must show "actual or threatened injury in fact [to itself *qua* organization] that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Id.* (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).

Defendants dispute that the LBA Plaintiffs have pled a sufficient injury-in-fact to support Article III standing. *See* Port Authority Br. at 8–11. To do so, a plaintiff must show: "[1] an invasion of a legally protected interest [2] which is concrete and particularized, and [3] actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).

The LBA Plaintiffs plead two injuries: that (1) "[LBA] and its members will be harmed [by implementation and enforcement of the Mutual Aid Agreement] in that they will no longer be able to assume the role of Incident Commander with complete control of an airport emergency's activities and coordination of resources; a function which they have traditionally and historically performed," FAC ¶ 9; and (2) "in the event of an airport emergency, should the plaintiff's members assume full command as per the ACM and AEPs, and disregard the terms of the Mutual Aid Agreement, it may subject them to potential liability," *id.*

As to the first asserted injury, the LBA Plaintiffs do not plead or explain why the ability to "assume the role of Incident Commander with complete control of an airport emergency's activities and coordination of resources," *id.*, is a "legally protected interest" of LBA's so as to support Article III standing, *Lujan*, 504 U.S. at 560. LBA does not allege that sharing the command with respect to a hypothetical future airport emergency would cause the organization to divert resources so as to cause LBA a pocketbook injury. *Cf., e.g., Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("[W]here an

organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." (citing *Havens Realty Corp.*, 455 U.S. 363, 379 (1989))).  Nor does it allege that sharing such duties would affect the organization's status, membership, or activities.  *Cf., e.g., Irish Lesbian and Gay Org.*, 143 F.3d at 650 (organization could make out Article III injury based on alleged harm to reputation); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (organization alleged sufficient injury to protected interest where allegedly unlawful activity required it to spend time attempting to combat activity's effects rather than undertaking normal operations); *Orthodox Jewish Coal. of Chestnut Ridge v. Village of Chestnut Ridge*, No. 19 Civ. 443 (KMK), 2021 WL 1226930, at *14 (S.D.N.Y. Mar. 31, 2021) (Article III injury supported by loss of membership).

Nor does LBA allege that its members have a "legally protected" right (deriving, e.g., from a statute, regulation, or contract) to occupy the role of Incident Commander and with "complete" rather than shared control over operations.  *See, e.g., Equal Vote America Corp. v. Congress*, 397 F. Supp. 3d 503, 508 (S.D.N.Y. 2019) (no standing where there was no plausible allegation of a legally protected interest in equally-sized congressional districts across states); *Diamond v. Charles*, 476 U.S. 54, 75 (1986) (a legally protected interest is one "accorded some degree of legal protection"); *cf. Strubel*, 842 F.3d at 188 (legally protected interest where created by statute); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (attorney-organization had cognizable interest in attending hearings as a matter of professional responsibility to clients).  LBA in fact affirmatively disclaims that it is suing for breach of contract.  *See* LBA Br. at 9 ("Plaintiffs are not alleging a breach of contract."); *cf., e.g., United Steel, Paper & Forestry, Rubber, Mfg. v. Cookson Am, Inc.*, 710 F.3d 470, 475–76 (2d Cir. 2013)

8

(union had standing to sue on own and members' behalf based on alleged breach of contract); *Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 45 (2d Cir. 2015) (contractual or otherwise possessory interest at stake can establish standing in Fair Housing Act zoning cases).[3]

In the end, the LBA Plaintiffs do not explain the concrete injury that will befall them were they to share, rather than exercise sole, command during an aircraft emergency, let alone why such an injury is to a legally protected right. Where a plaintiff makes only "conclusory allegations of injury or ask the [C]ourt to draw unwarranted inferences in order to find standing," such does not suffice. *Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003); *see also Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) ("Plaintiffs' threadbare assertions are conclusory and do not raise a reasonable inference of injury.").

As to the second alleged injury, involving the potential for liability to LBA members should they breach the Mutual Aid Agreement by insisting upon sole command in an aircraft emergency, the threat of litigation and exposure to liability can supply a cognizable injury-in-fact. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (like threat of criminal prosecution, threat of civil liability such as via administrative enforcement can establish harm for standing purposes). But significant and speculative intervening events would need to occur before any such injury could come to pass, making this claimed injury too "conjectural [and] hypothetical," and thus too far from imminent, to qualify. *Lujan*, 504 U.S. at 560. For the liability to come to pass, the following, at a minimum would need to occur. There would need to be an airport emergency. In connection with the emergency, a member of the LBA would need

---

[3] The Court does not resolve the parties' separate dispute whether plaintiffs, who are non-parties to several contracts at issue, lack standing to sue to enforce them. *See* Port Authority Br. at 5–8; LBA Br. at 8–10. The pertinent point as to these contracts is that plaintiffs have not alleged a cognizable injury in the form of a breach of contractual right.

to choose to breach the Mutual Aid Agreement, for example, by refusing to share command. The member's breach would need to draw attention: it would have to be, as the LBA Plaintiffs envision, "questioned or result in harm," LBA Br. at 8.  A third party would then have to take action to hold the LBA liable, through litigation or an "adverse regulatory process." *Id.*  The LBA Plaintiffs imagine the City or the FDNY, or perhaps the Federal Aviation Administration, initiating such action. *Id.*

This attenuated chain of events is of a piece with those that courts have found too conjectural to constitute an actual, imminent harm supporting Article III standing.  *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013) ("[R]espondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending"); *Roberts v. Bassett*, No. 22-622-CV, 2022 WL 16936210, at *2 (2d Cir. Nov. 15, 2022), *cert. denied sub nom.*, *Roberts v. McDonald*, 143 S. Ct. 2425 (2023) (injury not imminent where required plaintiffs to, among other things, test positive for covid, experience mild to moderate symptoms, seek treatment at a specific time after infection, from a healthcare provider who adheres to challenged guidance); *N.Y. Bankers Ass'n v. City of New York*, No. 13 Civ. 7212 (KPF), 2014 WL 4435427, at *11 (S.D.N.Y. Sept. 9, 2014) (holding that, because six intervening steps would need to take place before the plaintiff would suffer alleged harm, allegations "fail[ed] to make the leap from mere speculation to a credible threat").  That the chain of events postulated by the LBA Plaintiffs requires third parties to act to bring about the liability injury further calls into doubt the standing elements of causation and redressability.  *See, e.g., Lujan*, 504 U.S. at 560 (plaintiff must allege injury is fairly traceable to defendants' actions, "not the result [of] the independent action of some third party not before the court."); *Lower E. Side People's Fed. Credit Union v. Trump*, 289 F. Supp. 3d 568, 580–81

10

(S.D.N.Y. 2018) (injury theory that, after statements by administrative agency, banks as third-party actors would act so as to harm plaintiffs not viable, as injury was not fairly traceable to action by agency itself).

The LBA Plaintiffs have thus not pled an injury-in-fact sufficient to support a claim to organizational standing.

### 2.    Associational Standing

An organization can also establish standing to sue on behalf of its members in certain circumstances. *Hunt*, 432 U.S. at 343.  To establish associational standing, an organizational plaintiff must show that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (cleaned up).

To satisfy the first prong of this test, an organizational plaintiff must, at minimum, "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  Although it is unresolved after *Summers* whether a plaintiff must identify by name at least one member with standing to sue, an organizational plaintiff, at a minimum, must make allegations that in some way identify such a member, such as through affidavits establishing that "one or more of [the organization's] members . . . would be 'directly' affected" by the alleged illegal activity. *Id.* (quoting *Lujan*, 504 U.S. at 563).

Plaintiffs have not even attempted to do so here.  They have not pled that any individual LBA member stands to suffer harm from the activation or operation of the Mutual Aid Agreement.  They have not submitted supporting affidavits or exhibits to that effect.  Their FAC does not plead information to make the claim to this effect other than speculative and conclusory.

11

Plaintiffs instead broadly state that the LBA's members historically have been responsible for Incident Command and have had complete control during aircraft emergencies, and that these persons would somehow be harmed were the Incident Command position to be superseded by a cooperative Unified Command. FAC ¶ 17. That is not enough.

The LBA Plaintiffs' claim to have associational standing also fails because the plaintiffs do not adequately plead that any individual members would have standing to sue on his or her own behalf. As articulated above in connection with the claim of injury to LBA itself, the theory of injury to an individual member imagines a chain of events leading to legal liability (or similar harm such as termination) on the part of the member. The conjectural quality of that showing precludes a finding of injury in fact. *See, e.g.*, *Clapper*, 568 U.S. at 410; *Lujan*, 504 U.S. at 560. The LBA Plaintiffs have thus failed to plead a concrete, imminent injury to a legally cognizable interest of any members and hence to adequately allege associational standing.

## CONCLUSION

The finding that plaintiffs lack standing requires dismissal of this case, without prejudice, for lack of subject matter jurisdiction. The Court therefore lacks authority to reach defendants' separate motions to dismiss, under Rule 12(b)(6). *See, e.g.*, *Kelen v. Nordstrom, Inc.*, 259 F. Supp. 3d 75, 82 (S.D.N.Y. 2016) ("[B]ecause the Court has held that [plaintiff] lacks standing to pursue her claims, so as to require dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction, the Court has no occasion to reach [defendant's] arguments under Rule 12(b)(6)." (citing *Orenstein v. Compusamp, Inc.*, 19 Fed. R. Serv. 2d 466 (S.D.N.Y. 1974); *Price v. Saugerties Cent. Sch. Dist.* 305 F. App'x 715, 716 (2d Cir. 2009))).

Accordingly, and for the foregoing reasons, the Court grants defendants' motion to dismiss for lack of standing. The dismissal is without prejudice to file a new action consistent

with Article III standing.  The Clerk of Court is respectfully directed to terminate all outstanding motions and to close this case.

      SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 22, 2024
      New York, New York